**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| MARC BENJAMIN, | |
| **Plaintiff,** | |
| v. | Case No. 2:17-CV-2557-JAR-JPO |
| THE BOARD OF TRUSTEES OF BARTON COUNTY COMMUNITY COLLEGE, | |
| **Defendant.** | |

## MEMORANDUM & ORDER

Plaintiff Marc Benjamin brings this action against his former employer, the Board of Trustees of Barton County Community College ("Barton Community College" or "the College"). Plaintiff alleges that Barton Community College's termination of his employment violated Kansas public policy against retaliatory discharge for whistleblowing, and breached an express contract and an implied contract for continued employment. This matter is before the Court on the College's Motion for Summary Judgment (Doc. 36) on all of Plaintiff's claims. For the reasons discussed in detail below, the Court **grants** the College's motion for summary judgment in its entirety.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine issue of material fact

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4] An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]

---

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[10] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[11] Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## II.     Uncontroverted Facts

Under D. Kan. Rule 56.1(b), a memorandum opposing a motion for summary judgment must contain "a concise statement of material facts as to which the party contends a genuine issue exists." Importantly, D. Kan. Rule 56.1(b) requires that each fact in dispute "refer with particularity to those portions of the record upon which the opposing party relies."[16] As noted by the College, throughout his Response Plaintiff fails to consistently adhere to the standard provided for by D. Kan. Rule 56.1(b) and Fed. R. Civ. P. 56(c)(1)(A). Plaintiff controverts many of the College's facts with no reference to the record nor a discussion explaining the basis for his

---

[11] *Adams*, 233 F.3d at 1246.

[12] Fed. R. Civ. P. 56(c)(4).

[13] *Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15] *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[16] *See also* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support that assertion by: citing to particular parts of materials in the record . . . .").

challenge, or with general citations to his declaration or additional facts without specification or explanation. Accordingly, the Court deems undisputed those facts that Plaintiff failed to controvert with citation to particular facts in the record, if supported by the record.[17]

The following material facts are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff.

***Plaintiff's Employment Contracts with Barton Community College***

Plaintiff Marc Benjamin, currently a resident of North Carolina, is the former Head Softball Coach at Barton Community College, a community college established under the provisions of the Kansas Community College Act.[18] The College employed Plaintiff as Head Softball Coach from August 1, 2013 to May 8, 2017. Athletic Director Trevor Rolfs supervised Plaintiff. Until May 31, 2016, Rolfs was both the Athletic Director and the head coach for the women's basketball team.

Plaintiff and the College entered into a total of four employment contracts. Plaintiff first entered into a Contract of Employment for Head Coaching Services with Barton Community College to be the head coach of its softball program for the 2013–2014 academic year. Following the expiration of the 2013–2014 Coaching Contract, Plaintiff and Barton Community College entered into three additional head coaching contracts, with identical terms to the 2013–2014 Coaching Contract, for the 2014–2015 academic year, the 2015–2016 academic year, and the 2016–2017 academic year.[19] Plaintiff's termination occurred during the term of the Contract of Employment for Head Coaching Services with Barton Community College for the 2016–2017

---

[17] Fed. R. Civ. P. 56(e)(2).

[18] K.S.A. 72-120 et seq.

[19] The term for Plaintiff's 2014–2015 academic year Coaching Contract was August 1, 2014 to May 31, 2015. The term for Plaintiff's 2015–2016 academic year Coaching Contract was August 1, 2015 to May 31, 2016. The term for Plaintiff's 2016–2017 academic year Coach Contract was August 1, 2016 to May 31, 2017.

academic year ("2016–2017 Coaching Contract"). The 2016–2017 Coaching Contract stated that the parties "understood that the head coach is an employee at will and . . . hold[s] their position during the term of the Contract . . . unless relieved of their duties prior to the expiration of the Contract or unless he/she resigns."[20] The 2016–2017 Coaching Contract also provided that: (1) "[i]n the event of termination, notice shall be given in writing and the employee shall be entitled to no further compensation as a result of the termination;" and (2) "[t]he College may, at its option, terminate the employment agreement without cause and without prior notice when said termination is necessitated by decisions of the College's Trustees to deal with budgetary shortfalls and that said termination is needed to live within Legislative and enrollment budgets."[21] Plaintiff understood that the 2016–2017 Coaching Contract stated he was "an employee at will,"[22] and he testified in his deposition that he understood the terms of the 2016–2017 Coaching Contract.[23]

Barton Community College's Employment Policy No. 1460, effective October 8, 2007, states that the College's policies and procedures are "not intended to create an employment contract [and] should not be construed to constitute contractual obligations of any kind between the College and any employee."[24] This policy further states there is "[n]o continuing employment rights or property rights in positions of employment in positions of employment are [sic] granted to College employees other than as specified in state statute or the contracts of

---

[20] Doc. 40-4 ¶ 6.

[21] *Id.*

[22] Doc. 37-7, Pl.'s Supp. Resp. to Def.'s Req. for Admis. ¶ 4.

[23] Doc. 37-5, Benjamin Depo. at 72:9–13.

[24] Doc. 37-3, Knoblich Decl. ¶ 2; Doc. 37-3, Ex. A.

contractual employees."[25]  Plaintiff was aware of Barton Community College's employment
policies.[26]

### Athletic Conference Rules on Payment for Student-Athlete Travel

Barton Community College is a member of both the National Junior College Athletic
Association ("NJCAA") and Kansas Jayhawk Community College Conference ("KJCCC").
Plaintiff's employment contracts required Plaintiff to abide by "all regulations, and policies of
the College and its authorized representatives, as well as all Jayhawk Conference, regional, and
NJCAA rules and regulations[.]"[27]  The College and its employees were required to comply with
NJCAA rules, and its President, Dr. Carl Heilman, instituted a "zero tolerance" policy for
NJCAA and KJCCC violations.[28]  A violation of the NJCAA rules could result in probation for
the College's athletic program.

The NJCAA defines an "Athletic Scholarship," also referred to as a "grant-in-aid," as
"any institutional athletic aid given to any student, from any source, on the basis of his/her
athletic capabilities or athletic association."[29]  For Division I programs, which includes Barton
Community College's basketball programs, the colleges may provide "a maximum grant-in-aid"
consisting of tuition and fees, room and board, course related books, school supplies, and
"[t]ransportation costs one time per academic year to and from the college by direct route."[30]
The KJCCC also governs "grants-in-aid" to student athletes at member institutions.  The KJCCC
rules regarding "grants-in-aid" are the same as the NJCAA's rules with nine exceptions.  Among

---

[25] Doc. 37-3, Knoblich Decl. ¶ 2; Doc. 37-3, Ex. A.

[26] Doc. 37-5, Benjamin Depo. at 51:19–54:3.

[27] Doc. 40-4 ¶ 5.

[28] Doc. 44-4, Rolfs Depo. at 24:9–13.

[29] Doc. 37-2, Rolfs Decl. ¶ 25.

[30] *Id.*

these nine exceptions, which include categories such as tuition, room and board, and medical treatment for injuries, is an exception for travel which provides that "[t]rips for recruits ten (10) days prior to the start of a semester are not allowed."[31] There is no exception or comment in the KJCCC rules relating to payments for transportation costs of student athletes to and from the college.

As Athletic Director, Rolfs was responsible for "[p]reparing and recommending the department's annual budget to the Dean of Administration as well as overseeing and administering the budget."[32] Rolfs testified in his deposition that he would review and approve flights for students purchased by the College and those that were purchased by head coaches.[33] Rolfs understood the KJCCC rules to allow its member colleges to pay for travel costs as grant-in-aid in accordance with the NJCAA rules. Rolfs knew that, in line with this interpretation, the College provided occasional transportation costs to students. In the summer of 2016, however, this practice stopped.

On July 7, 2016, KJCCC Commissioner Bryce Roderick emailed athletic directors of the member colleges, including Rolfs, explaining the KJCCC rules regarding trips for athletes. Roderick's email explained how he had learned of confusion regarding paid trips by athletes to the college. He clarified that "[t]he KJCCC By-laws doesn't [sic] allow for aid trips by signed athletes to and from home or to the college" and that "under no circumstances can a signed athlete be given a paid trip."[34] Roderick's email led to telephone calls between KJCCC member institutions and Roderick.

---

[31] *Id.* ¶ 26.

[32] *Id.* ¶ 1.

[33] Doc. 44-7, Rolfs Depo. at 22:16–23:7.

[34] Doc. 37-2 ¶ 28.

Rolfs believed that Roderick's statements were inconsistent with the NJCAA rules and the statement that the KJCCC allows the same grant-in-aid as allowed by the NJCAA except as otherwise stated.[35] Roderick sent a follow-up email on July 8 to explain his interpretation of the KJCCC rule. He advised that if a member institution was "paying transportation costs at anytime, [it] should self report this violation to the Conference Office so that [he] can take action" and that if a member institution knew that others were providing transportation, it should also report the violation to the Conference Office.[36] He further explained that "[paying transportation costs] is a clear violation and gaining an advantage over other colleges that are not providing transportation costs."[37]

Although he disagreed with Roderick's interpretation of the KJCCC, Rolfs testified that Barton Community College complied with Roderick's instruction and ended its practice of paying for student-athlete transportation costs in July 2016. Rolfs explained Roderick's interpretation of the KJCCC rule and the prohibition on paying for transportation costs to all of the College's coaches, including Plaintiff.

***Plaintiff's Reports of Alleged Violations of Athletic Conference Rules***

Plaintiff met with Rolfs on February 20, 2017 to inform him that he had learned that the College's men's and women's basketball coaches had paid for student flights to and from home, which violated athletic conference rules. Plaintiff had received a list of at least six players whose flights appeared to have been paid for by the athletic department and a student whose flight had been paid for by another coach.

---

[35] *Id.*

[36] *Id.* ¶ 29.

[37] *Id.*

Plaintiff reported this to Rolfs because he was concerned about potential violations.[38]  He did not want Rolfs to be "caught off guard" if someone found out about the alleged violations, especially because of the College's history with NJCAA and KJCCC violations.[39]  Rolfs was suspicious of Plaintiff's reports of KJCCC violations because he believed Plaintiff was unhappy with his employment, particularly with Rolfs, but accepted Plaintiff's report and investigated his allegations.  Rolfs took handwritten notes during the meeting and according to Plaintiff, seemed uncomfortable and irritated.  Plaintiff emailed Rolfs to document his report, concluding his email with "I hope you will handle this matter professionally and that I will not be treated unfairly within the department."[40]

During his investigation of Plaintiff's complaints, Rolfs found two payments pertaining to the transportation of three men's basketball players and one women's basketball player, all of which had been submitted and approved before Roderick's July 2016 emails.  According to Rolfs, the men's tickets were properly purchased during allowable recruitment time under other KJCCC rules, and the women's ticket was purchased before the July emails for a student athlete to travel for the start of classes in August 2016.  Rolfs also determined that since July 7, 2016, Barton Community College had not paid travel costs for any student athletes.

In early March 2017, Rolfs informed Roderick that he was investigating Plaintiff's allegations of potential conference violations and explained that he had evidence of two requisitions submitted before Roderick's July 7, 2016 email.  The two agreed that Rolfs should finish his internal investigation and report back to Roderick, who would determine if the violations existed and if they did, what sanctions would be imposed.  In March 2017, Rolfs told

---

[38] Doc. 44-7 ¶ 4.

[39] *Id.*

[40] Doc. 37-5, Benjamin Depo. at 192.

Plaintiff that he had looked into the misuse of funds report and spoken with Roderick, and that the College was okay.[41]  In April 2017, Rolfs again spoke to Commissioner Roderick at the KJCCC/Region VI meetings regarding the reported violations.  They agreed to confer and resolve the issue by the end of May 2017.

During the same time-frame, Plaintiff met with Angela Maddy, Barton Community College's Dean of Student Services.  Maddy oversees the College's student services, but has no administrative or managerial authority over the College's athletic department.  Plaintiff, who according to Maddy seemed disgruntled, complained about a variety of things, including his treatment by Rolfs and the distribution of booster funding to programs in the athletic department.  Plaintiff also mentioned that some of the athletic programs or teams provided flights for student athletes.  Maddy encouraged Plaintiff to take his concerns through his chain of command.  She did not report any part of the conversation to others until May 10, 2017, after student basketball players met with her and expressed concerns about the athletic department providing flights for student athletes.  During her discussion with the students, Maddy recalled the conversation she had with Plaintiff about the College paying for student flights, and accordingly reported the information about the students' complaints and her conversation with Plaintiff to Dr. Heilman.[42]

On or about May 6, 2017, Plaintiff encountered Roderick at the Region VI Softball Tournament.  Plaintiff asked Roderick to explain KJCCC's procedure for reporting conference violations and whether Rolfs had informed Roderick about the potential basketball violations.  Roderick responded that Rolfs had mentioned he was looking into some potential conference violations, but that Rolfs had not gotten back to him on the subject.

---

[41] *Id.* at 196:16–197:1.

[42] Doc. 37-4, Maddy Decl. ¶ 3.

On May 20, 2017, Rolfs met with Roderick at the NJCAA Track & Field Nationals to discuss Plaintiff's report of violations. Rolfs learned that Plaintiff had asked Roderick about his February 20, 2017 report of possible violations. According to Rolfs, this was the first time he heard of Plaintiff contacting Roderick or the KJCCC regarding the allegations.[43] Roderick and Rolfs discussed the findings of the investigation of the reported violations, and Roderick informed Rolfs that there would be no sanctions because the issues had been addressed in 2016 and were considered closed.

***Termination of Plaintiff's Employment***

In April of 2016, Plaintiff told Rolfs that he felt underappreciated and that there was a lack of support for the softball program. In May 2016, Rolfs learned that Plaintiff had depleted his fundraising account from around $18,000 to $1,000. According to Rolfs, this violated Plaintiff's contract because his job description required that he establish a functional budget, maintain awareness of expenditures and stay within his budget.[44] In June 2016, Rolfs met with Plaintiff for Plaintiff's annual performance review. Plaintiff had achieved a 51-8 record, the best in the softball team's history. Rolfs addressed both Plaintiff's successes and his concerns about Plaintiff's performance based on Plaintiff's negative attitude over the preceding months, his failure to adequately maintain the softball facilities, and his inability to manage the budget. According to Rolfs, Plaintiff responded by insinuating that Rolfs should not worry about those matters.[45] Despite the foregoing issues, Rolfs recommended that Plaintiff's contract be renewed for the 2016–2017 academic year, and agreed with the College's decision to give him a raise in compensation.

---

[43] Doc. 37-2, Rolfs Decl. ¶ 39.

[44] *Id.* ¶ 14.

[45] *Id.* ¶ 15.

During the summer of 2016, Rolfs observed that there were few Letters of Intent from softball recruits. However, Plaintiff did have thirteen Letters of Intent for the 2017–2018 season. In August 2017, Rolfs learned that Plaintiff had failed to recruit new student athletes for the softball program and that most of the 2015–2016 team was not returning. Plaintiff, who was "caught off guard"[46] when six to seven players did not return, only had nine players on his roster as opposed to the expected twenty. By December, the roster had fifteen student athletes and by April 2016, the roster only had twelve. According to Rolfs, the failure to recruit violated Plaintiff's contract and job description, which required that he produce a competitive program, attract and sign student-athletes, and field athletes and teams that can compete for championships.[47] By October 2016, because Rolfs believed Plaintiff was disgruntled and blaming Rolfs for his problems, he informed the College's Director of Human Resources, Julie Knoblich, that Plaintiff was a disgruntled employee who would attempt to discredit him. Around this time, Plaintiff and the former assistant softball coach made allegations to Knoblich and Maddy that Rolfs made inappropriate sexual, racial and demeaning comments, and Rolfs denies making these comments.

By mid-April 2017, Rolfs had received complaints from softball players and parents about Plaintiff's behavior, and was concerned that Plaintiff was taking his frustrations with his job and Rolfs out on the team.[48] On April 11, 2017, Rolfs met with Knoblich to discuss his decision to not recommend renewal of Plaintiff's contract. Between April 11 and April 24, Rolfs received telephone calls and emails from softball team members and parents about Plaintiffs' behavior and compiled a report based on these calls and emails. Rolfs's report contained

---

[46] Doc. 37-5, Benjamin Depo. at 103:1–104:10.

[47] Doc. 37-7, Rolfs Decl. ¶ 19.

[48] Doc. 37-2 ¶ 34.

descriptions of Plaintiff's behavior from January 2016 through April 2017. Rolfs also included

eight emails, dated from October 4, 2013 through April 24, 2017, that he received from parents

and softball players. Rolfs received six of these emails after his April 11, 2017 conversation

with Knoblich. With respect to these emails, Rolfs testified that after parents and student

initiated conversations regarding concerns about Plaintiff's coaching performance with him, he

would then ask them to send him the concerns they shared in writing for documentation

purposes.[49] As to the report, Rolfs testified that "[t]hings are documented throughout the course

of every year. This document itself was created fully the day I sent it in an email,"[50] which he

clarified as being around April 2017. According to Plaintiff and the former assistant softball

coach, he "did not yell in the faces of any players and it was not [his] practice to single out a

player for ridicule or criticism."[51]

     Rolfs met with Dr. Heilman to recommend that Plaintiff's contract not be renewed. Dr.

Heilman informed Rolfs that, in consultation with the Board of Trustees, the College would

terminate Plaintiff's employment immediately following the softball season. Dr. Heilman

prepared a memorandum outlining the reasons for terminating Plaintiff. Prior to his termination,

Plaintiff had not been disciplined during his employment with the College. The College's

employment policies did not provide for progressive discipline. Instead, the College had

discretion to employ a list of alternatives, including termination, to discipline employees.

     On May 8, 2017, Rolfs met with Plaintiff and informed him that the College was

terminating his employment immediately. Rolfs provided Plaintiff the May 8, 2017

memorandum written by Dr. Heilman regarding his termination. According to the

---

[49] Doc. 44-4, Rolfs Depo. 42:1–44-13.

[50] *Id.* at 39:1–40:19.

[51] Doc. 44-1, Benjamin Decl. ¶ 8; *see also* Doc. 44-2, Voss Decl. ¶ 7.

memorandum, Barton Community College terminated Plaintiff's employment due to: (1) insubordination; (2) verbal harassment; (3) unprofessional conduct; and (4) his inability to manage the Softball Program in an appropriate and professional manner.[52] Although it terminated Plaintiff's employment before the expiration of the 2016–2017 Coaching Contract, Barton Community College paid Plaintiff the full compensation required under the contract as if Plaintiff had provided services through May 31, 2017.

## III. Discussion

Plaintiff brings three alternative state law claims against Barton Community College—breach of express contract, breach of implied contract for continued employment, and common law retaliatory discharge. The College seeks summary judgment on each of Plaintiff's claims. As explained in detail below, the Court grants summary judgment in favor of the College on all of Plaintiff's claims.

### A. Breach of Contract Claims

Plaintiff alleges two breach of contract claims under Kansas law—one arising out of an express contract with Barton Community College and the other arising out of an alleged implied contract for continued employment with Barton Community College. The Court addresses each in turn.[53]

---

[52] Doc. 37-2 ¶ 38.

[53] Plaintiff asserts damages arising out of lost wages and benefits, compensatory or noneconomic losses, and punitive damages. Doc. 31 at 11–12. In addition to arguments regarding Plaintiff's ability to establish breach of contract claims, Defendants argue that Plaintiff has not suffered damages from the alleged breach of the employment contract. In light of the clear determination that Plaintiff cannot sustain a cause of action under either a breach of express contract or breach of implied contract theory, the Court declines to address Defendants' argument related to the damages alleged by Plaintiff.

### 1.      Breach of Express Contract

Plaintiff alleges that Barton Community College breached the 2016–2017 Coaching Contract by terminating his employment without cause.  The College contends that it did not breach any express contract as the contract provided for an at-will employment relationship, which either party could terminate at any time, for any reason.  The Court finds that Plaintiff was an employee at-will, and that the College did not breach the 2016–2017 Coaching Contract as a matter of law.

The construction of a written contract is a question of law.[54]  Generally, if the language in a written contract "is clear and can be carried out as written there is no room for rules of construction."[55]  "In considering a contract which is unambiguous and whose language is not doubtful or obscure, words used therein are to be given their plain, general and common meaning, and a contract of this character is to be enforced according to its terms."[56]  "The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow."[57]  "Where a contract is complete and unambiguous on its face, the court must determine the intent of the parties from the four corners of the document, without regard to extrinsic or parol evidence."[58]  The provisions of a written contract must be interpreted as a whole and in harmony, rather than in isolation.[59]

---

[54] *See, e.g., Ponds ex rel. Poole v. Hertz Corp.*, 158 P.3d 369, 372 (Kan. Ct. App. 2007).

[55] *Gore v. Beren*, 867 P.2d 330, 336 (Kan. 1994) (quotation omitted).

[56] *Wagnon v. Slawson Exploration Co.*, 874 P.2d 659, 666 (Kan. 1994) (quoting *Barnett v. Oliver*, 858 P.2d 1228, 1238 (Kan. Ct. App. 1993)) (internal quotation omitted).

[57] *Kay–Cee Enter., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999) (quoting *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 926 P.2d 669, 674 (Kan. Ct. App. 1996)).

[58] *Id.* (citing *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 887–88 (Kan. 1992)).

[59] *Decatur Cty. Feed Yard, Inc. v. Fahey*, 974 P.2d 569, 574 (Kan. 1999) (citations omitted).

Generally, employment will be deemed at at-will unless there is an express or implied contract governing the duration of employment.[60] Here, the written 2016–2017 Coaching Contract provided for Plaintiff's employment as the College's Head Softball Coach. Whether the College breached this employment contract necessarily involves interpreting that contract. The 2016–2017 Coaching Contract provided for a specific duration of employment to begin on August 1, 2016, and end on May 31, 2017. Despite this, the contract also stated that the parties "understood that the head coach[, Plaintiff,] [wa]s an employee at will" and that he would hold the position "during the term of the Contract . . . unless relieved of [his] duties prior to the expiration of the Contract or unless [he] resigns."[61] This language is unambiguous. It unequivocally establishes that the College employed Plaintiff as the Head Softball Coach as an at-will employee during the term of contract.

Plaintiff asserts that a rational jury could find that the College breached the express employment contract because of the contract language that "[t]he College, may, at its option, terminate the employment agreement without cause and without prior notice when said termination is necessitated by decisions . . . to deal with budgetary shortfalls[.]"[62] In arguing that the College's ability to terminate Plaintiff was limited, however, Plaintiff ignores preceding sentences which state "[i]n the event of termination, notice shall be given in writing . . ." and that Plaintiff was an at-will employee.[63] The contract does not provide that Plaintiff could *only* be terminated in the event of a budgetary shortfall. Instead, the contractual language relied upon by Plaintiff merely explains the College's termination rights in the event of a budgetary shortfall.

---

[60] *Campbell v. Husky Hogs, L.L.C.*, 255 P.3d 1, 3 (Kan. 2011) (citing *Morriss v. Coleman Co.*, 738 P.2d 841, 846–47 (Kan. 1987)).

[61] Doc. 40-4 ¶ 6.

[62] *Id.*

[63] *Id.*

Moreover, Plaintiff does not argue that the contractual provisions are ambiguous, and to the extent he implies this argument, the Court finds the contract is unambiguous. An ambiguity argument also conflicts with Plaintiff's deposition testimony that there was nothing in the contract that was unclear to him about the College's right to terminate his employment at anytime.

Therefore, as provided by the 2016–2017 Coaching Contract, Plaintiff was an at-will employee of the College at the time of his termination. When employment is terminable at will, "the employee states no cause of action for breach of contract by alleging that he has been discharged."[64] Accordingly, Plaintiff's claim for breach of express contract fails as a matter of law, and the Court grants summary judgment in favor of the College on Plaintiff's breach of express contract claim.

### 2.    Breach of Implied Contract

Plaintiff additionally alleges that Barton Community College breached an implied contract for Plaintiff's continued employment as Head Softball Coach. Defendant asserts that the facts do not support the existence of an implied contract for continued employment because Plaintiff relies solely on his unilateral beliefs of the existence of said implied contract. Viewing the facts in a light most favorable to Plaintiff, the Court finds there was no implied contract for Plaintiff's continued employment as a matter of law.

As previously discussed, Kansas has long adhered to the doctrine of employment at-will.[65] One exception to the at-will employment relationship recognized by Kansas courts is the

---

[64] *Davis v. LumaCorp, Inc.*, 992 F. Supp. 1250, 1253 (D. Kan. 1998) (citing *Pilcher v. Bd. of Wyandotte Cty. Comm'rs*, 787 P.2d 1204, 1207 (Kan. Ct. App. 1990)).

[65] *Hysten v. Burlington N. Santa Fe Ry. Co.*, 108 P.3d 437, 440 (Kan. 2004) (quoting *Riddle v. Wal–Mart Stores, Inc.*, 998 P.2d 114, 115 (Kan. Ct. App. 2000)).

existence of an implied in fact contract.[66]  Under Kansas law, an implied employment contract

exists when an employer cannot terminate an employee arbitrarily because a "policy or program

of the employer, either express or implied, restricts the employer's right of termination at will."[67]

In *Morriss v. Coleman Co.*,[68] the Kansas Supreme Court articulated the following factors in

determining the existence of an implied contract:

> written or oral negotiations, the conduct of the parties from the
> commencement of the employment relationship, the usages of the
> business, the situation and objective of the parties giving rise to the
> relationship, the nature of the employment, and any other
> circumstances surrounding the employment relationship which
> would tend to explain or make clear the intention of the parties at
> the time said employment commenced.[69]

Whether an implied contract exists to prevent arbitrary termination of employment is

normally a question of fact for the jury.[70]  However, as "a contract implied in fact arises from

facts and circumstances showing mutual *intent* to contract,"[71] an implied agreement "cannot be

established solely by the employee's subjective understanding or expectation about his or her

employment."[72]  Thus, "summary judgment may be granted [in the defendant's favor] if the

plaintiff presents only evidence of his own unilateral expectations of continued employment."[73]

---

[66] *Kastner v. Blue Cross & Blue Shield of Kan., Inc.*, 894 P.2d 909, 915 (Kan. Ct. App. 1995) (citation omitted) ("One of the most important exceptions to the employment-at-will doctrine allows an action for wrongful discharge when an employee is fired in breach of an implied-in-fact contract of employment.").

[67] *Allsup v. Mount Carmel Med. Ctr.*, 922 P.2d 1097, 1100 (Kan. Ct. App. 1996) (quoting *Brown v. United Methodist Homes for the Aged*, 815 P.2d 72, 81 (Kan. 1991)).

[68] 738 P.2d 841 (Kan. 1987).

[69] *Id.* at 848–49 (quoting *Allegri v. Providence-St. Margaret Health Ctr.*, 684 P.2d 1031, 1033 Syl. ¶ 5 (Kan. Ct. App. 1984)).

[70] *Id.* at 848; *Anglemyer v. Hamilton Cty. Hosp.*, 58 F.3d 533, 537 (10th Cir. 1995).

[71] *Kastner*, 894 P.2d at 915 (quotation omitted).

[72] *Id.* (citation omitted).

[73] *Conyers v. Safelite Glass Corp.*, 825 F. Supp. 974, 977 (D. Kan. 1993) (citation omitted); *see also Taylor v. Home Depot USA, Inc.*, 506 F. Supp. 2d 504, 519 (D. Kan. 2007) (granting summary judgment where plaintiff relied on her own contentions and beliefs that her employer's intent was to not fire its employees without cause, but

Plaintiff asserts that he has presented evidence of his own expectation of continued employment and of the College's intent to enter into such an implied contract. The College asserts that it had no intent to enter into an implied contract with Plaintiff. Plaintiff has established no facts, other than his subjective, unilateral belief, that support the existence of an implied employment contract. To support his assertion that the parties shared a mutual intent to enter into an implied contract for continued employment, Plaintiff relies on the following facts: (1) the annual renewal of his contract until his termination; (2) the head coach for the men's track team being employed for seven or eight years at the time of Plaintiff's termination; (3) the head coach for the men's basketball team being employed for about ten years at the time of Plaintiff's termination; and (4) Rolfs's use of substantial documentation to justify Plaintiff's termination.[74]

Even viewed in the light most favorable to Plaintiff, as a matter of law these facts do not support a claim for breach of implied contract. They do not indicate the College intended to enter into an implied contract for Plaintiff's continued employment. Instead, the facts support Plaintiff's unilateral belief of an implied contract based on successful employment with the College. However, "[t]he mere fact that an employee has not been previously terminated under written contractual employment-at-will provisions does not create an implied contract for continuing employment."[75] Otherwise, Kansas's at-will employment doctrine would be undermined, and any successful employment relationship could result in an implied contract for

---

failed to show her employer intended to enter into an agreement restricting its ability to terminate an employee at will).

[74] Doc. 43 at 26.

[75] *Dickens v. Snodgrass, Dunlap & Co.*, 872 P.2d 252, 260 (Kan. 1994) (affirming a grant of summary judgment when the plaintiff relied on her continued employment with pay increases and satisfactory employment to support her theory of an implied contract for continued employment despite written, contractual employment-at-will provisions).

continued employment.  Accordingly, in the absence of facts demonstrating the parties' mutual intent to enter into an implied contract for Plaintiff's continued employment, the Court grants summary judgment in favor of Barton Community College on Plaintiff's breach of implied contract claim.

B.      **Common-law Retaliatory Discharge**

Despite Kansas's employment at-will doctrine, Kansas courts recognize a common-law tort for wrongful discharge in violation of public policy when a terminated employee has acted as a whistleblower.[76]  Plaintiff claims he was wrongfully discharged in retaliation for whistleblowing, based on his reporting that the College had violated KJCCC rules regarding paying for student-athlete transportation.  As explained below, the Court grants summary judgment on Plaintiff's retaliatory discharge claim as the record does not contain clear and convincing evidence to support an inference that the College's reasons for terminating Plaintiff were pretextual.

Wrongful discharge claims under Kansas law are analyzed using the three-part framework established in *McDonnell Douglas v. Green*.[77]  Under this framework, the plaintiff has the initial burden of establishing a prima facie case that raises a rebuttable presumption of retaliatory intent.[78]  Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nonretaliatory justification for the discharge.[79]  Finally, if the defendant meets this burden, the burden shifts back to the plaintiff to "assert specific facts establishing a triable issue as to whether the employer's reason for discharge is a mere cover-up

---

[76] *Hysten v. Burlington N. Santa Fe Ry. Co.*, 108 P.3d 437, 440 (Kan. 2004) (citations omitted).

[77] 141 U.S. 792, 824 (1973); *see Balfour v. Medicalodges, Inc.*, No. 05-2086-KHV, 2006 WL 37620410, at *12 (D. Kan. Dec. 19, 2006) (citing *Foster v. AlliedSignal, Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002)).

[78] *Foster*, 293 F.3d at 1193.

[79] *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1116 (10th Cir. 2001).

or pretext for retaliatory discharge."[80]

Under Kansas law, a retaliatory discharge claim must be established "by a preponderance of the evidence, but the evidence must be clear and convincing in nature."[81] The Kansas Supreme Court has concluded that a plaintiff "need not meet the clear and convincing standard at the summary judgment stage of the proceedings."[82] Because a federal court evaluating state claims is guided by federal standards governing summary judgment procedure, the evidentiary standard that Kansas courts apply on summary judgment do not apply.[83] "[A] plaintiff in federal court who opposes a summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate fact finder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer."[84] Plaintiff is not required, however, to establish the elements of his or her prima facie case by clear and convincing evidence.[85] The clear and convincing evidence standard applies once the burden shifts back to plaintiff to demonstrate that the employer's proffered reasons for termination are pretextual.[86]

## 1.      Prima Facie Case

To state a prima facie case for retaliatory discharge based on whistleblowing, Plaintiff must establish that (1) a reasonably prudent person would have concluded that Barton

---

[80] *Foster*, 293 F.3d at 1194 (quoting *Braken v. Dixon Indus., Inc.*, 38 P.3d 679, 682 (Kan. 2002)).

[81] *Ortega v. IBP, Inc.*, 874 P.2d 1188, 1198 (Kan. 1994).

[82] *Rebarchek v. Farmers Coop. Elevator*, 35 P.3d 892, 898 (Kan. 2001).

[83] *See Foster*, 293 F.3d at 1194–95.

[84] *Id.* at 1195.

[85] *Id.* at 1193 n.3 (holding plaintiff to such standard at prima facie stage would pervert logic of *McDonnell Douglas* burden-shifting scheme adopted by Kansas courts; claimant's prima facie case not onerous burden).

[86] *Id.* at 1193 (if employer offers legitimate, nondiscriminatory reason for termination, burden shifts to plaintiff to show clear and convincing evidence of retaliation).

Community College violated rules, regulations, or the law pertaining to public health, safety, and general welfare; (2) Barton Community College had knowledge of Plaintiff's reporting of the alleged violation prior to his termination; and (3) Barton Community College terminated Plaintiff's employment in retaliation for his complaints.[87] "However, the whistleblowing must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain."[88] The parties do not articulate a dispute regarding whether Plaintiff reported the alleged violations in good faith. Barton Community College asserts that as a matter of law, Plaintiff cannot establish a prima facie case of retaliatory discharge because Plaintiff cannot establish the first and second elements of his prima facie case. The Court finds that, taking all inferences in a light most favorable to Plaintiff, Plaintiff has satisfied his burden of establishing a prima facie case of retaliatory discharge based on whistleblowing.

### a. The College's Alleged Violations of Relevant Rules

Defendant argues that Plaintiff's reports of alleged violations of rules related to paying costs of travel for student athletes do not satisfy the first prong of a prima facie case of retaliation. The first element of a prima facie case of retaliatory discharge based on whistleblowing is that "a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare."[89] "To support a retaliatory discharge claim, the public policy must be 'so definite and fixed that its existence is not subject

---

[87] *Palmer v. Brown*, 752 P.2d 685, 686 (Kan. 1988).

[88] *Id.* at 689–90.

[89] *Id.* at 690.

to any substantial doubt.'"[90]  Additionally, a plaintiff's claim must be directed at "violations of specific and definite rules, regulations, or laws."[91]  The Court finds that, at the summary judgment stage, Plaintiff's reports of alleged KJCCC violations satisfy these requirements.

First, to the extent that Plaintiff alleged violations of internal policies, the College asserts that "it is well established that violations of internal operating policies and procedures will not support a retaliatory discharge claim."[92]  While this statement misconstrues the strength of the law, courts have found that violations of internal operating policies and procedures will not support a claim for retaliatory discharge.[93]  Here, the Court does not find that the record supports a notion that the College's internal policies and procedures requiring compliance to athletic conference rules promotes public safety, health or general welfare.  Moreover, Plaintiff does not articulate why these internal policies and procedures promote public health, safety, or the general welfare, and thus should be treated differently.  Accordingly, any complaints Plaintiff made regarding misuse of funds in violation of internal policies and procedures cannot establish the first element of his prima facie case of retaliatory discharge.

The College also argues that Plaintiff's complaints regarding violation of the KJCCC cannot be the basis for a claim of retaliatory discharge.  After an extended explanation of why its

---

[90] *Goodman v. Wesley Med. Ctr.*, 78 P.3d 817, 593 (Kan. 2003) (quoting *Palmer*, 752 P.2d 685).

[91] *Id.* at 591.

[92] Doc. 37 at 34.

[93] *See Taylor v. Home Depot USA, Inc.*, 506 F. Supp. 2d 504, 520 (D. Kan. 2007) (finding that the evidence cited by the plaintiff "failed to cite any evidence showing that her alleged whistleblowing pertained to any serious violation of rules or laws affecting public health, safety or welfare"); *Herman v. Western Fin. Corp.*, 869 P.2d 696, 704–05 (Kan. 1994) (affirming summary judgment on a retaliatory discharge claim and, holding that the specific internal policies at issue did not qualify as rules, regulations, or law pertaining to public health, safety, and the general welfare; *see also Cory v. City of Basehor*, No. 12-2547-JTM, 2014 WL 3396273, at *7 (D. Kan. July 11, 2014) (finding that the plaintiff could not establish the first element of a *prima facie* case of retaliatory discharge when the internal policies and procedures were too vague to qualify the plaintiff for whistleblower protection, and explaining that the holding in *Herman* was not that "internal policies could *never* qualify as 'rules' in a whistleblower claim").

interpretation of the athletic conference rules was reasonable,[94] the College argues that the allegedly violated rules are not specific and definite rules, regulations or laws pertaining to public health, safety, and general welfare.  However, viewing the facts in a light most favorable to Plaintiff, a reasonable jury could find that Plaintiff alleged violations of such rules.

In *Goodman*, the plaintiff argued that she was terminated in retaliation for reporting violations pursuant to the [Kansas Nurse Practice Act ("KNPA")], "which provides that a nursing license can be revoked if a nurse is found to have committed an act of professional incompetency as defined by [the Act]."[95]  The defendant argued that "the KNPA [wa]s not specific enough to establish clear public policy rules, regulations or law as the basis for a retaliatory discharge claim because it refer[red] to an undefined standard of care that requires a factual determination by the Kansas State Board of Nursing."[96]  The Supreme Court of Kansas determined that the KNPA requirement that nurses adhere to an articulated standard of care, which turns on the facts in each case, was insufficient to serve as a specific and definite rule pertaining to the public health and safety.[97]  Thus, the plaintiff failed to establish that a reasonable prudent person would have concluded her employer was engaged in acts violating rules regarding public health, safety, and the general welfare because the KNPA did not provide definite or specific rules and whether a violating occurred involves subjective opinions and determinations.[98]

---

[94] Whether the College's interpretation of the athletic conference rules was reasonable is not at issue.  As previously laid out, the standard for establishing a *prima facie* case of retaliation is whether a "reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violations of rules, regulations, or the law pertaining to public health, safety, and the general welfare[.]"  *Goodman v. Wesley Med. Ctr., L.L.C.*, 78 P.3d 817, 821 (Kan. 2003).

[95] *Id.* at 821.

[96] *Id.* at 822.

[97] *Id.* at 822–23.

[98] *See id.*

Here, the uncontroverted facts show that Plaintiff complained of alleged violations of the KJCCC rules on paying for travel costs for student athletes. The College does not dispute that it paid for travel costs to student athletes as allowed under the NJCAA rules before July 7, 2017, when the KJCCC clarified that these payments were not allowed under KJCCC rules. The College argues that because it had interpreted the KJCCC to allow for these types of payments until Roderick's July 7 email, that these rules are ambiguous, and that the record does not support that the College's actions were inherently wrongful. Roderick, however, requested that if a member institution was "paying transportation costs at anytime, [it] should self report this violation to the Conference Office so that [he] can take action" and that if a member institution knew that others were providing transportation, it should also report the violation to the Conference Office.[99] He also explained that "[paying transportation costs] is a clear violation and gaining an advantage over other colleges that are not providing transportation costs."[100]

Despite Rolfs's disagreement with Roderick's application of the KJCCC rules, unlike the KNPA rules at issue in *Goodman*, there is no indication that whether the KJCCC rules at issue are violated involve a subjective determination or turned on the facts of each case. Moreover, whether the College's acts were inherently wrongful has no bearing on whether a reasonably prudent person would have concluded that the College violated rules, regulations, or the law pertaining to public health, safety, and general welfare. At the summary judgment stage, inferences are viewed in the light most favorable to Plaintiff. Accordingly, based on the uncontroverted facts, a reasonable jury could conclude that the College had violated specific

---

[99] Doc. 37-2 ¶ 29.

[100] *Id.*

rules meant to promote the general welfare. Therefore, Plaintiff's reports of alleged violations satisfy the first prong of a prima facie case of retaliatory discharge.

### b. Knowledge of Plaintiff's Reports

In addition to requiring the employer to have knowledge of the reporting, Kansas law requires the plaintiff to provide evidence that he reported the alleged violations to "*either company management or law enforcement officials*."[101] However, a "whistleblower's report [does not have to] be made to a party with the authority to rectify the problem."[102] The critical step is that "[a] worker who wants to come under the protections of [their decision to report a violation] must seek out the intervention of a higher authority, either inside or outside the company."[103] Importantly, "[i]f the plaintiff reports the wrongdoing to corporate management, he must do so to management higher than that of the wrongdoer."[104]

The College argues that Plaintiff cannot show that the College had knowledge that he reported the alleged violations and that he did not report the alleged violations to appropriate higher management or law enforcement prior to the termination of his employment. Plaintiff asserts that he reported alleged violations of KJCCC athletic conference rules to three

---

[101] *Fowler v. Criticare Home Health Servs., Inc.*, 10 P.3d 8, 14 (Kan. Ct. App. 2000) (emphasis in original) (quoting *Palmer*, 752 P.2d at 690).

[102] *Shaw v. Southwest Kan. Groundwater Mgmt. Dist. Three*, 219 P.3d 857, 863 (Kan. Ct. App. 2009) (discussing the standard for reporting an alleged violation as found in *Fowler*).

[103] *Fowler*, 10 P.3d at 876 (Kan. Ct. App. 2000) (finding that a mere threat "to blow the whistle" prior to being terminated is insufficient to satisfy the requirement of reporting alleged violations to higher authority in a claim for retaliatory discharge); *see also Shaw*, 219 P.3d at 863.

[104] *Lykins v. CertainTeed Corp.*, No. 11-2133-JTM, 2012 WL 5471254, at *7 (D. Kan. Nov. 9, 2012) (citing *Shaw*, 219 P.3d at 863); *see also Conrad v. Bd. of Johnson Cty. Comm'rs*, 237 F. Supp. 2d 1204, 1268 (D. Kan. 2002) (finding that the plaintiff could not satisfy the requirement of reporting to higher management or law enforcement when she objected and complained about the alleged wrongdoer's decision to the alleged wrongdoer); *Goenner v. Famland Indus., Inc.*, 175 F. Supp. 2d 1271, 1280 (D. Kan. 2001) ("The only reasonable interpretation of *Fowler*'s requirement of seeking out 'a higher authority' or 'higher management' is that it requires the plaintiff to report the wrongdoing to someone in authority above the wrongdoer."); *Shaw*, 219 P.3d at 863 (finding that a board, which had the ability to renew the wrongdoer's employment, constituted a higher authority within a company).

individuals: (1) Rolfs, his supervisor and the Barton Community College Athletic Director, (2) Maddy, Barton Community College Dean of Student Services, and (3) Roderick, the KJCCC Commissioner. However, these complaints are insufficient, as a matter of law, to establish Plaintiff's claim of retaliatory discharge.

The undisputed facts show that on February 20, 2017, Plaintiff met with Rolfs to inform him that the College's men's and women's basketball coaches had paid for student flights to and from home in violation of athletic conference rules. A former softball player had provided Plaintiff a list of six players whose flights appeared to have been paid for by the athletic department and one player whose flight had been paid for by another coach. As Plaintiff reported this directly to him, Rolfs clearly had knowledge of this reporting of the alleged violations prior to recommending Plaintiff's contract not be renewed and Plaintiff's termination.

However, the College argues Rolfs is an alleged wrongdoer and thus an inappropriate figure for Plaintiff to have complained to. A plaintiff who alleges wrongdoing to management within a company, "must do so to management higher than that of the wrongdoer."[105] "Any objection or complaint that [a plaintiff] made to [the wrongdoer] would not qualify as a report to higher management or to law enforcement."[106] As the Athletic Director, Rolfs was responsible for preparing and recommending the department's annual budget to the Dean of Administration and overseeing and administering the budget. Rolfs also testified that he reviewed and approved flights purchased for students and those purchased by head coaches. However, taking all inferences in light most favorable to Plaintiff, the record does not suggest that Plaintiff complained that Rolfs himself was purchasing the flights, that Plaintiff knew Rolfs had approved

---

[105] *Lykins*, 2012 WL 5471254, at *7 (citing *Shaw*, 219 P.3d at 863).

[106] *Conrad*, 237 F. Supp. 2d at 1268.

these flights, or that Rolfs knew these flights had been purchased in violation of KJCCC rules. Instead, the undisputed facts show only that Plaintiff reported to Rolfs allegations that the College's basketball coaches had purchased flights for students in violation of KJCCC rules and that Rolfs then investigated these complaints. Accordingly, Plaintiff's February 20 report to Rolfs satisfies the second prong of a prima facie case of retaliatory discharge.

However, as a matter of law, Plaintiff's reports to Maddy and Roderick do not constitute reporting to management or law enforcement. During Plaintiff's meeting with Maddy, he mentioned that some athletic programs or teams provided flights for students, and Maddy encouraged him to take his concerns to his superiors. On May 10, 2017, after receiving similar reports from students, Maddy emailed the College's president, informing him of the student reports and that Plaintiff had mentioned similar concerns earlier, but that she had assumed they had been resolved. This Court need not determine whether Maddy constituted a higher management authority because, even viewing the facts in a light most favorable to Plaintiff, the record does not support a finding that the College knew of Plaintiff's report to Maddy prior to terminating him. It is uncontroverted that Maddy informed Dr. Heilman about her discussion with Plaintiff on May 10, 2017, two days after the College terminated Plaintiff. Therefore, as a matter of law, Plaintiff's report to Maddy of alleged violations is insufficient to establish his claim for retaliatory discharge.

Lastly, Plaintiff informed KJCCC Commissioner Roderick on May 6, 2017 about the alleged violations. The Court need not determine whether Roderick was an appropriate authority figure for Plaintiff to report the alleged KJCCC violations to as the record does not support an inference that the College knew of this reporting prior to terminating Plaintiff. The uncontroverted facts establish that: (1) the College terminated Plaintiff on May 8, 2017; (2) Rolfs

had previously recommended to the College's Director of Human Resources on April 11, 2017

not to renew Plaintiff's contract for the 2017–2018 academic year; (3) the College's President

informed Rolfs, that in consultation with the Board of Trustees, the College would terminate

Plaintiff's employment immediately following the softball season; and (4) Rolfs did not learn of

Plaintiff's May 6, 2017 discussion with Roderick about the alleged violations until May 20,

2017, at the NJCAA Track & Field Nationals.[107]  Plaintiff cites to no facts suggesting that

Roderick shared the discussion he had with Plaintiff with anyone at the College prior to

Plaintiff's termination.  Moreover, it was Dr. Heilman and the Board of Trustees who decided to

terminate Plaintiff's employment prior to the expiration of the 2016–2017 Coaching Contract,

not Rolfs who had suggested to not renew Plaintiff's employment nearly a month before Plaintiff

reported the alleged violations to Roderick.  Therefore, as a matter of law, Plaintiff's reporting of

the alleged violations to Roderick also cannot serve as the foundation for his retaliatory

discharge claim.

### c.    Causation

Neither party explicitly addresses whether Plaintiff can establish the third prong of a

claim of retaliatory discharge—that the College terminated Plaintiff's employment in retaliation

for his complaints to Rolfs.  Viewing the facts in a light most favorable to Plaintiff, the Court

finds that this prong is satisfied by the temporal proximity between Plaintiff's complaints to

Rolfs and his termination.  Generally, a causal connection exists between the protected activity

and materially adverse action "where the plaintiff presents evidence of circumstances that justify

---

[107] Plaintiff attempts to controvert the fact that Rolfs first learned of Plaintiff's May 6, 2017 discussion with Roderick on May 20, 2017 by pointing to Rolfs's deposition testimony that he did not recall the exact dates in May when he spoke with Roderick about Plaintiff's allegations.  Doc. 43 at 7–8.  While this leads to an inference that Rofls spoke with Roderick multiple times about Plaintiff's allegations, this does not controvert his declaration that he learned of Plaintiff's May 6 conversation with Roderick about the possible violations on May 20 at the NJCAA Track & Field Nationals.

an inference of retaliatory motive."[108]  "One must only introduce evidence from which an inference can be drawn that an employer would not have taken the adverse action had the employee not [engaged in whistleblowing]."[109]  "Proximity in time between the [complaint] and discharge is a typical beginning point for proof of a causal connection."[110]

The uncontroverted facts show (1) that Plaintiff reported his allegations to Rolfs on February 20, 2017; (2) that Rolfs recommended to the Director of Human Resources that Plaintiff's contract not be renewed on April 11, 2017; (3) that sometime between April 11, 2017 and May 8, 2017 Rolfs and Dr. Heilman discussed Plaintiff's employment; and (4) that Rolfs met with Plaintiff and informed him that his employment was being terminated immediately on May 8, 2017.  While there is no minimum time-frame requirement for temporal proximity to establish a causal connection, courts have found that a three-month lag between protected activity and termination does not establish a causal connection, but that a one and a half month period between protected activity and adverse action may establish a causal connection.[111]  Here, there are less than three-months between Plaintiff's report to Rolfs and his termination and less than two months between Plaintiff's report to Rolfs and Rolfs's recommendation to not renew Plaintiff's contract.  Viewing the facts relating to the timing in the light most favorable to

---

[108] *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007) (discussing the causation analysis for a prima facie case in a Title VII retaliation case).

[109] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (discussing the causation analysis for a prima facie case in a Title VII discrimination case).

[110] *Rebarchek v. Farmers Co-op. Elevator*, 35 P.3d 892, 899 (Kan. 2001).

[111] *See Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006) (holding one and one-half months establishes causation while three months is too long and does not), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (indicating that a period of six weeks gives rise to a rebuttable inference of a causal connection, but that a period of three months does not).

Plaintiff, this is sufficient temporal proximity to establish the third-prong of a prima facie case of retaliatory discharge.

While the College briefly mentions in its Reply that there is no evidence that Dr. Heilman or the Board of Trustees, who made the final decision to terminate Plaintiff, knew of his February 2017 report to Rolfs,[112] this is contrary to the facts. It is uncontroverted that Rolfs met with Dr. Heilman and recommended not renewing Plaintiff's contract, and that Dr. Heilman then informed Rolfs that, in consultation with the College's Board of Trustees, the College would terminate Plaintiff's employment immediately following the softball season. The College does not provide any facts regarding what occurred during this discussion. At summary judgment, all inferences are drawn in Plaintiff's favor. Accordingly, Plaintiff can establish a prima facie case of retaliatory discharge.

### 2.     Legitimate, Non-Retaliatory Reason for Termination

As Plaintiff establishes a prima facie case of retaliatory discharge based on his report of alleged violations to Rolfs, the Court considers the College's reasons for Plaintiff's termination. As its legitimate, non-retaliatory reason of Plaintiff's termination, the College states it terminated Plaintiff because Plaintiff was insubordinate and engaged in verbal harassment and unprofessional conduct demonstrating an inability to manage the College's softball program in an appropriate and professional manner. The relevant issue is not whether the stated reasons were wise, fair, or correct but whether the defendant honestly believed in those reasons and acted in good faith.[113] In examining this issue, a court must "look at the facts as they appear to the person making the decision to terminate plaintiff."[114] The Court's role is not to second guess an

---

[112] Doc. 50 at 29.

[113] *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004).

[114] *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000).

employer's business judgment.[115]  The Court finds that the College has met its burden with its articulated reasons for Plaintiff's termination and turns to the third step of its analysis.

### 3. Pretext

At this step of the *McDonnell Douglas* inquiry, the burden shifts back to Plaintiff to show that a reasonable jury could find the College's proffered reason for termination pretextual.  A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[116]  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.[117]  "[T]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."[118]  As noted, the College maintains that it terminated Plaintiff because Plaintiff was insubordinate and engaged in verbal harassment and unprofessional conduct, demonstrating an inability to manage the College's softball program in an appropriate and professional manner.  The Court finds that the record does not contain clear and convincing evidence to create a genuine issue of material fact and support an inference of pretext.

---

[115] *Stover*, 382 F.3d at 1076.

[116] *Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[117] *Kendrick*, 220 F.3d at 1230.

[118] *Patel v. Univ. of Kan. Hosp. Auth.*, 345 F. App'x 343, 345 (10th Cir. 2009) (quotation omitted).

Plaintiff argues that evidence of not receiving any formal disciplinary action prior to his reporting of the alleged violations to Rolfs demonstrates pretext. However, the lack of formal discipline cannot establish pretext because the College's employment policies do not require progressive discipline,[119] and, the record does not suggest that Plaintiff was treated differently than those similarly situated to him with respect to the discipline process. Additionally, Plaintiff's assertion that allegations of Rolfs's inappropriate conduct discredits the College's defense is inappropriate at the summary judgment stage as the Court does not weigh the credibility of the evidence at summary judgment.[120] Moreover, Plaintiff's allegations are that Rolfs made sexual, racial, and demeaning comments, which Plaintiff and the former assistant softball coach told Maddy and Knoblich about in October 2016. Assuming the truth of these allegations, Rolfs's comments have no bearing on whether the stated reasons for Plaintiff's May 2017 termination—insubordination and unprofessionalism—are pretextual, and they have no relationship to any of the other facts Plaintiff points to as evidence of pretext.

Plaintiff also argues that the record shows excessive documentation of Plaintiff's activities prior to his termination, which demonstrates an apparent attempt to paper his file to support his termination. He notes that Rolfs admitted to carefully preparing a timeline documenting Plaintiff's behavior, which he finalized in April 2017, and that Rolfs collected emails of parent and student complaints about his conduct. Plaintiff relies on *Marshall v. General Motors, LLC* as support for his papering theory.[121] The Court finds *Marshall*

---

[119] *See Lobato v. N.M. Env't Dep't*, 733 F.3d 1283–90 (10th Cir. 2013) (finding that a plaintiff could not establish pretext based on failure to use progressive discipline when the record did not support a finding that progressive discipline was mandatory).

[120] *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994) ("[On] a motion for summary judgment [the court] cannot evaluate credibility nor can [it] weigh the evidence.").

[121] *Marshall v. General Motors LLC*, No. 2:16-cv-02651, 2017 WL 5465270 (D. Kan. Nov. 14, 2017).

distinguishable. In *Marshall*, the court determined that a reasonable jury could find that the plaintiff's supervisor papered his file to justify removing the plaintiff from his supervisory position because of his complaint about a racist remark of his supervisor.[122] In the seven months prior to the complaint, the plaintiff's supervisor documented two instance of performance-related issues.[123] However, in the seven months between the time of the plaintiff's complaint and the decision to return the plaintiff to a non-supervisory position, the plaintiff's supervisor documented more than a dozen issues, some of which did not necessarily relate to plaintiff's performance.[124]

Here, while the record shows that the number of player and parent complaints about Plaintiff increased between the time he reported the alleged KJCCC violations to Rolfs and his termination, it is undisputed that these complaints came from softball players and their parents, not directly from Rolfs. Although Plaintiff notes that Rolfs requested the complaints about Plaintiff's coaching behavior be submitted in writing, it is uncontroverted that the players and parents initiated conversations with Rolfs, and that Rolfs then requested they articulate their concerns in writing for documentation purposes. Moreover, while Plaintiff asserts that he did not yell in the faces of or ridicule players, there are no allegations that Rolfs falsified any of the complaints or emails, and the record does not support an inference that Rolfs solicited these complaints from the parents and students. With respect to Rolfs's documentation of Plaintiff's performance, it is also uncontroverted that Rolfs's timeline of Plaintiff's performance issues spans from January 2016, when Rolfs first noticed Plaintiff's performance issues, to April 2017, and although he finalized this time in April 2017, that "things are documented throughout the

---

[122] *Id.* at *8.

[123] *Id.*

[124] *Id.*

course of the year."[125]  Even viewing these facts in a light most favorable to Plaintiff, a reasonable jury could not infer that Rolfs papered Plaintiff's file.

Accordingly, the Court finds that a reasonable jury could not find that the College's proffered reasons for terminating Plaintiff are unworthy of belief as the record does not contain clear and convincing evidence that reveals a genuine issue of material fact as to pretext.  The College is therefore entitled to summary judgment on Plaintiff's claim of retaliatory discharge.

**IT IS THEREFORE ORDERED BY THE COURT** that Barton Community College's Motion for Summary Judgment (Doc. 36) is **granted.**  Plaintiff's case is dismissed in its entirety.

**IT IS SO ORDERED.**

Dated: February 1, 2019

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

---

[125] Doc. 44-4, Rolfs Depo. at 39:1–40:19.